### R. J. EDERER CO. *v.* KAVANAUGH.

PRINCIPAL AND AGENT—SALES—AUTHORITY TO PURCHASE.

 Evidence that plaintiff sold to an agent of defendant fishing nets ordered in the name of defendant to be used in a branch of defendant's business in a town separate from the main office; that the agent had been appointed by defendant to conduct his fishing business at the place in question for half the profits, and was to furnish a gasoline tug which should be kept in repair at the expense of the business; that supplies, gasoline and wages should be paid for from the proceeds, the principal to furnish money necessary to run it and allow the agent to check out funds from the bank as such agent, with evidence tending to show notice to defendant of the purchase, warranted judgment for plaintiff against the principal for the price of the nets. OSTRANDER and STONE, JJ., dissenting.

Error to Bay; Collins, J. Submitted April 2, 1912. (Docket No. 152.) Decided February 19, 1913.

Assumpsit by R. J. Ederer Company against William P. Kavanaugh for goods sold and delivered. Judgment for defendant on a verdict directed by the court. Plaintiff brings error. Reversed.

*Stoddard & McMillan,* for appellant.

*Lewis P. Coumans,* for appellee.

MCALVAY, J. Plaintiff, an Illinois corporation, manufacturer of nets and netting for fishing purposes, brought this suit against defendant, who is engaged in the wholesale fish business, with general offices at Bay City, and at the time this controversy arose was engaged in the same business at Port Huron and Sarnia. The suit was commenced by declaration in assumpsit for certain fish nets and twine alleged to have been sold to defendant by plaintiff in the year 1909. After all the evidence in the case was closed, the court directed a verdict for defendant. Plaintiff has removed the case to this court by writ of error, asking for a reversal of the judgment entered upon such directed verdict.

Evidence was offered in the case tending to prove that defendant, who was doing business under the name of Kavanaugh & Co., of Bay City, and A. W. Selkirk, of Port Huron, entered into a contract in writing as follows:

"Agreement made this 17th day of April, 1909, by A. W. Selkirk, of Port Huron, Mich., party of the first part, and Kavanaugh & Company, of Bay City, Mich., party of the second part, witnesseth: In consideration of the premises party of the first part agrees to take charge of the second party's fishing business at Port Huron and Sarnia, which is represented largely by existing contracts with individual fishermen, and devote his time and best energies and skill in promoting the same during the fishing season of 1909, as directed from time to time by the second party, and this contract may be extended from year to year if mutually agreeable to the parties hereto. First party further agrees to furnish for use in said business, rent free, properly fitted out for business, his gasoline tug, named W. H. Selkirk, but necessary repairs during the season to be made at the expense of the business. It is agreed also that the business shall pay for gasoline and necessary supplies for operating said fish tug and wages of the men who run the same. First party also

furnishes, rent free, for the use of said second party's business, one-half of his fish house in Port Huron. It is agreed that said first party shall be paid, for his services and the use of his said tug and fish house, a salary equal to one-half of the net profits of the business of said second party, managed by said first party in Port Huron and Sarnia, as aforesaid, after deducting all the expenses incurred in said business. It is agreed that the money necessary for the business shall be furnished by the said second party and shall be kept on deposit, in the name of said second party, in some Port Huron bank, to be hereafter agreed upon, and said first party shall have authority to sign checks on said bank account, as agent of said second party, in the payment for fish and the freight thereon and in payment of wages. All receipts of said business shall first be deposited promptly in said bank account, and all monies paid out shall be paid by checks on said account, and said first party shall have no authority to sign checks for any purpose other than herein enumerated. Adjustment shall be made and wages paid to said first party, if earned, Sept. 1st and Dec. 1st of each year.

[Signed]    "A. W. Selkirk.
"W. P. Kavanaugh.

"Witness:  H. C. Hertz."

The business of defendant at Port Huron was carried on in the same name as that at Bay City and was known as a branch of defendant's business. Prior to the sale of the goods for which this suit was brought, plaintiff frequently had sold defendant goods. After the contract was entered into between defendant and Selkirk, the latter took charge of the branch business at Port Huron, and operated it during the season of 1909. The goods were ordered by Selkirk in the name of W. P. Kavanaugh & Co., upon the letter heads of defendant, and were shipped by plaintiff in due course of business upon its understanding that Selkirk was acting as the agent of defendant in such transaction. A short time prior to the time these goods were ordered Kavanaugh stated to plaintiff's general manager that his branch business at Sarnia had been removed to Port Huron, and stated that he was connected with or had Selkirk operating for

him. It also appears that the goods were shipped, received, and used upon this tug which was employed in defendant's business, with other gill nets which defendant had furnished; that bills and statements of account were sent in due course of business to Kavanaugh & Co. at Port Huron; that Kavanaugh came to Port Huron with his bookkeeper from Bay City, who made the entries in defendant's books of all but one of the items of this account in sundry expense account, in the presence of defendant; that entries were also made on the books of a credit of $118; that of this payment made on this account by Selkirk $18 was cash and $100 a check of W. P. Kavanaugh & Co.; that a trial balance was taken off from these books by the bookkeeper for Kavanaugh; that the bookkeeper was there several times for the purpose of doing necessary work upon these books; that it appears that the balance claimed by plaintiff and testified to by its general manager to be due was $383.46; that the goods were sold in the usual course of business by plaintiff, who dealt with Selkirk in good faith as the agent of defendant who was managing the business at Port Huron.

The instruction by the court of a verdict for defendant was on the ground that no evidence was in the case tending to establish agency or authority upon the part of Selkirk to purchase these goods or that defendant held Selkirk out as his agent to plaintiff. In our opinion the court was in error in instructing a verdict for defendant. All of the testimony in the case referred to, except the written contract, was introduced by plaintiff. Under the rule which prevails where a verdict is instructed, this testimony presented in the case will be considered in the light most favorable to the plaintiff in error. It is not disputed that Selkirk represented the defendant at Port Huron in the conduct and management of his branch business. From the testimony of plaintiff, as above set forth, we, without hesitation, determine that questions of fact were presented which should have been submitted to

a jury for consideration. This is the only question to be determined upon this record.

The judgment of the circuit court is reversed, and a new trial ordered.

Steere, C. J., and Moore and Brooke, JJ., concurred with McAlvay, J.

Ostrander, J. (*dissenting*). The court having directed a verdict for the defendant, it is the contention of plaintiff—

"That the action of the court in directing a verdict for the defendant was error because the court should have submitted to the jury the questions of whether or not defendant's agent, Selkirk, had implied authority to order the goods on behalf of the defendant, whether or not the defendant held out Selkirk as his agent in the matter, and whether or not the purchase of the goods was subsequently ratified by defendant."

The agreement between defendant and A. W. Selkirk appears from the copy thereof set out in the opinion of Mr. Justice McAlvay. The business of the defendant, formerly conducted from the port of Sarnia, afterwards from that of Port Huron, had never been, in whole or in part, the business of fishing with gill nets. It was the business of buying fish from pond-net fishermen, collecting the fish, and marketing them. No change in this business ever occurred or was ever authorized by the defendant, except that, having on hand a few gill nets, he sent them to his agent, Selkirk, at Port Huron, upon the suggestion of Selkirk that, in going to and from port with the fishing tug which was operated in the business, he could set and raise the gill nets without any particular loss of time and perhaps add some profit to the business. Selkirk was himself engaged with another tug in gill-net fishing, and continued to be so engaged during the fishing season of 1909.

I have examined the record with care and find no testimony therein tending to prove that defendant ever author-

ized Selkirk to purchase any goods of any kind from plaintiff or from any other person excepting such articles as were necessary for the maintenance of the tug used in the business of collecting and carrying the fish which were purchased. On the contrary, any such authority is expressly denied by Selkirk, who testified to no more than this, that he suggested that more gill nets could be profitably used, a suggestion to which the defendant made no reply. He says he assumed it would be all right if he bought the gill nets. Clearly, Selkirk had no implied authority to order the goods which he did order of the plaintiff. It is just as clear from the testimony that Selkirk was not the general agent of the defendant to buy paraphernalia for the buisiness which defendant had established or apparatus to extend the business into fields into which defendant had not extended it.

Did defendant hold out Selkirk as his agent in the matter ? The defendant had had dealings with the plaintiff for a considerable period of time, had always paid his bills promptly, and at the time the goods were ordered by Selkirk he had an account with the plaintiff. Defendant's principal office was at Bay City, and the business which he conducted at Port Huron was a branch or subsidiary part of the main business of buying and selling fish. While defendant did business as W. P. Kavanaugh & Co., there was no company, and plaintiff so understood and did not regard Selkirk as the company at Port Huron. No orders were received by the plaintiff from the Bay City office in relation to the goods, and no inquiry was made at that office, and no advices were sent to that office of the fact that goods had been ordered by Selkirk to be sent to Port Huron to defendant. The letters which were written in ordering the goods were signed W. P. Kavanaugh & Co., but after the signature was the letter "S," and plaintiff knew that the letters so written were written by Mr. Selkirk. The goods were charged by plaintiff, not to the account of W. P. Kavanaugh & Co. already appearing upon their books, but to W. P. Kav-

anaugh & Co., Port Huron, a new account. The testimony of the representative of plaintiff, through whose hands the business passed, is to the effect already stated, and further:

"*Q.* Now, Mr. Edsall, W. P. Kavanaugh & Co. is an assumed name, is it not?

"*A.* I do not know about that.

"*Q.* Did you know anybody by that name?

"*A.* I knew one W. P. Kavanaugh. Before extending credit or making a charge against W. P. Kavanaugh Company, I remember of Mr. Kavanaugh remarking about an agreement or arrangement or something like that with Selkirk, and furthermore the stationery reads, 'Main Office, Bay City.'

"*Q.* Is that all of the matter you looked up to ascertain who you were shipping those goods to?

"*A.* Yes. * * *

"*Q.* You knew that Selkirk was the man that was ordering the goods, and you sent them there without consulting Kavanaugh?

"*A.* No, sir.

"*Q.* Do you mean to say that the letters that you have testified and identified as the handwriting of Mr. Selkirk that you didn't know at the time that they were going to him.

"*A.* As Mr. Kavanaugh's representative at Port Huron, yes. I did nothing outside of what I have stated to ascertain the fact whether or not they were going to Kavanaugh & Co., meaning Mr. Kavanaugh.

"*Q.* So, then, you shipped those goods without making any investigation as to the authority of the agency of Mr. Selkirk?

"*A.* No, because of the statement made by Mr. Kavanaugh when in our place that he had connection with Mr. Selkirk, I assumed that it was not necessary to inquire further."

The same witness further testified:

"Mr. W. P. Kavanaugh was in the factory of R. J. Ederer & Co. a short while prior to the time the nets were ordered and stated that they had had a branch at Sarnia but had removed it to Port Huron.

"*Q.* Did Mr. Kavanaugh say anything further to you

about the matter of who had been in charge of the Sarnia branch, and so on ?

"*A.* He also remarked that he was connected, as near as I can remember, he was connected or had Selkirk operating for him; the exact words I cannot remember, but it was to that effect."

There is no testimony tending to show that anybody at any previous time had ordered, or assumed to order, goods from plaintiff or from any other person as agent of the defendant.

It is undoubtedly the rule that the authority of the agent must depend, so far as it involves the rights of innocent third persons who have relied thereon, upon the character bestowed rather than the instructions given. The principal is bound to third persons acting in ignorance of any limitations by the apparent authority given and not by the express authority. Plaintiff says:

"Under this doctrine we contend that defendant is liable because he held out Selkirk as his agent. This holding out began at the time defendant was in the factory of the plaintiff at Chicago and stated to plaintiff's credit man, Mr. Edsall, that defendant had had a branch at Sarnia but had removed it to Port Huron, and that he was then connected with Selkirk, or had Selkirk operating for him. This conversation was such as to cause the credit man to understand that Selkirk was operating the branch at Port Huron for defendant. The holding out was further continued by defendant allowing Selkirk to use stationery bearing defendant's name and an inscription showing that the general office was at Bay City and the branch at Port Huron. Relying upon this holding out, plaintiff sold the goods upon the credit of the defendant."

In my opinion, it must be said, as matter of law, that the conduct of defendant described was not calculated to mislead the plaintiff, did not occur under circumstances which justified the claim that the alleged principal (the defendant) should have expected that the representations would be relied and acted upon, and, this being so, it is immaterial whether what defendant said was relied upon

and acted upon in good faith to the injury of the plaintiff. All of these elements of estoppel, and not merely some of them, must be present in such a case. *Clark* v. *Dillman*, 108 Mich. 625 (66 N. W. 570); *Marx* v. *King*, 162 Mich. 258 (127 N. W. 341). And while, as has been stated, it is immaterial whether the other elements necessary to constitute the estoppel exist, it seems clear that plaintiff did not exercise ordinary business prudence in filling an order made by Selkirk upon defendant's account.

Was the purchase of the goods subsequently ratified by defendant? Ratification by partial payment is attempted to be proven by Selkirk, called as a witness by the plaintiff. He testified as follows:

"They have on this bill here I have testified to—that is, on the books—a credit of $118, under date of June 18th. Eighteen dollars of it was paid by cash and $100 paid by check. I paid the $18 cash to J. R. Ederer, one of the firm R. J. Ederer Co. He ran short that night at dinner and he wanted some money. I paid that out individually. The hundred dollars I paid with a check of W. P. Kavanaugh & Co.

"Q. Who gave you authority to draw a check of W. P. Kavanaugh & Co.?

"A. Well, excuse me—I am not sure, I think it was W. P. Kavanaugh & Co.'s check. It might have been my own, but I would have to look it up. I was not asked to look that up, under my subpœna. Nothing in there about the checks at all."

The check was not produced, and there is no further testimony upon this subject, beyond this, that Selkirk testified that he took credit upon the books which he kept at Port Huron for the $18. The only other testimony which is supposed to show ratification by the defendant of the action of plaintiff and the agent Selkirk is testimony of the keeping of a set of books at Port Huron. It is the contention of plaintiff that there is a presumption that a person is cognizant of the contents of his own books of account. In this case, the presumption was overcome by the testimony of the defendant. It is true that defendant

took his bookkeeper from Bay City to Port Huron upon one occasion, when he found out that Selkirk had not opened a set of books, and where a set was opened by the bookkeeper. Selkirk gave to the bookkeeper such memoranda, bills, and statements of account, as he had preserved, and the bookkeeper without directions made entries upon the books. Defendant was present when the bookkeeper actually made the entries, during a portion of the time. During a portion of the time he was over at Sarnia, and Selkirk testified:

"I don't think he took pains to look it over at all. He would have to stand here to look over his shoulder to see that, you know."

It is true, also, that a trial balance was furnished from the books of defendant, but this was after the goods had been purchased from the plaintiff, and defendant testified, and his testimony is uncontradicted, that the trial balance did not state the names or headings of the accounts. It appears, too, that the bookkeeper entered the transaction with the plaintiff in an account called "Sundry Expense." It is true that in one instance Selkirk testified as follows, speaking of the account of the plaintiff·

"Why didn't you pay it?
"A. I didn't have enough money.
"Q. Why didn't you call Kavanaugh's attention that he was in debt over in Chicago and ask him to pay the money as the contract provided he should furnish you the money?
"A. Mr. Kavanaugh saw the credits on the ledger."

But he also testified:

"Q. So Kavanaugh hadn't any knowledge of what was on the books or if the books and accounts was sent to you you did not call his attention to it?
"A. Only from the trial balance.
"Q. You say he had a trial balance?
"A. Yes, sir."

But suppose Mr. Kavanaugh did discover, after the fact, that his agent at Port Huron had wrongfully paid

out $118 of his money. How can it be said that this discovery of wrongdoing was a ratification of his agent's act in ordering goods on his account? It appears, and is undisputed, that some time after the fishing season was over, after defendant had discontinued operating at Port Huron, he was notified by the plaintiff about the account which is in question here, and payment was requested. This was in the fall of 1909. He at once denied any responsibility for the account, paid his own account to plaintiff, and refused to pay the account in question. Thereafter no communication upon the subject appears to have passed between plaintiff and the defendant until the fall of 1910, when they again asked him to pay the account, to recover which they have now brought this action.

Because I do not find in the record any testimony tending to prove either that defendant's agent, Selkirk, had implied authority to order the goods on his account, or was held out by defendant as his agent in the matter, or that the purchase of the goods was ratified by defendant, I disagree with the conclusion announced by Mr. Justice McAlvay in his opinion, and hold that the judgment of the trial court should be affirmed, with costs to the appellee.

Stone, J., concurred with Ostrander, J.